IN THE UNITED STATES DISTRICT COURT OF NEBRASKA

| | |
|---|---|
| Jennifer M. King, an Individual,<br>Plaintiff,<br><br>vs.<br><br>Catholic Health Initiatives, a Non-Profit<br>Foreign Corporation Operating in Nebraska,<br>Defendant. | Civil Action No.<br><br><br>COMPLAINT<br><br>(Jury Trial demanded in Omaha, Nebraska) |

## COMPLAINT

Plaintiff, Jennifer M. King, (hereinafter "Dr. King") brings forth this Complaint against Defendant, Catholic Health Initiatives, a Non-Profit Foreign Corporation operating in Nebraska, (hereinafter "CHI") and states as follows:

## INTRODUCTION

1. This is an action for damages to address the deprivation of rights ensured to Dr. King by violating Title VII of the Civil Rights Act of 1964 §2000e *et seq.* on the bases of sex, Section 48-1104 of the Nebraska Fair Employment Act, and other civil causes of action related to her employment as plead herein.

## JURISDICTION AND VENUE

2. Paragraph 1 is restated and reincorporated as if fully set forth herein.

3. The jurisdiction of this Court over the controversy stated above is invoked pursuant to the provisions of 28 U.S.C.A. §1331, the exhaustion of administrative remedies pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, and 28 U.S.C. §1343.

4. Dr. King timely brings this civil action within ninety days of receipt of the Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission issued on May 9, 2018.

5. Dr. King was at all times, and remains a resident of the State of Nebraska, in Douglas

1

County.

6. The majority of events alleged in this Complaint occurred in Douglas County, Omaha, Nebraska.

7. This Court has supplemental jurisdiction over the within claims not involving a federal question.

## PARTIES

8. Paragraphs 1 through 7 are restated and reincorporated as if fully set forth herein.

9. Dr. King is a female and a former employee of CHI and is entitled to protection pursuant to the provisions of Title VII of the Civil Right Act of 1964.

10. CHI is a Non-Profit Foreign Corporation operating in Nebraska that employs greater than fifteen employees and was the former employer of Dr. King within the meaning of Title VII of the Civil Right Act of 1964.

11. Dr. King timely filed a charge of discrimination against CHI based on sex with the Nebraska Equal Opportunity Commission ("NEOC"), complaining of the acts of discrimination set forth below.

12. On May 9, 2018, Dr. King received her right to institute this action by way of Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission.

## FACTS

13. Paragraphs 1 through 12 are restated and reincorporated as if fully set forth herein.

14. Dr. King began her employment at CHI in April of 2003.

15. Dr. King is a Caucasian female from Douglas County, Omaha, Nebraska.

16. During her tenure with CHI, Dr. King was promoted multiple times, ultimately obtaining the position of Director of Pharmacy at Bergan Mercy Medical Center, Creighton

University Medical Center, and Lasting Hope Recovery Center.

17. Beginning in late 2014, CHI employee, Lawrence P. Kelly developed a crush on Missy Thiede, a subordinate of Dr. King. After Ms. Thiede informed Mr. Kelly of her disinterest, he continued his pursuit causing Dr. King to reiterate to Mr. Kelly to not bother Ms. Thiede.

18. Mr. Kelly's behavior around Dr. King and Ms. Theide became more alarming. Dr. King reported Mr. Kelly's behavior to her supervisors, Chris Evans and Todd Hoffman in Human Resources.

19. In January of 2015, Mr. Kelly focused his attention on Dr. King, he would repeatedly make statements such as that he was going to disappear and that only one thing can make him stay; Mr. Kelly would hover very closely to Dr. King as he said this.

20. On January 14, 2015, Dr. King forwarded a list to Todd Hoffman on the "red flags" to look for in dangerous stalking behaviors and workplace violence to show how Mr. Kelly was acting in a similar manner.

21. On January 27, 2015, Dr. King inquired with Human Resources about the Family Medical Leave Act (FMLA) for Mr. Kelly who was considering inpatient psychiatric treatment.

22. Mr. Kelly continued to make inappropriate statements to Dr. King. He would grow frustrated when Dr. King would not respond to work text messages and would lurk outside of her office. Mr. Kelly would follow Dr. King around, stare at her for uncomfortable amounts of time, stand uncomfortably close, and intrude on conversations.

23. On March 12, 2015, Mr. Kelly expressed suicidal thoughts to Dr. King and was brought down to the emergency room by Dr. King and Ms. Thiede. Dr. King enrolled Mr. Kelly in FMLA and filed a mandatory report.

24. On March 30, 2015, Dr. King emailed Jeff Newman (Investigator with the Department

of Public Health) outlining Mr. Kelly's behavior up until that point. In that e-mail, Dr. King expressed her fear for her safety as well as the safety of other employees and the public.

25. After six weeks of FMLA leave, Mr. Kelly returned in May of 2015. His behavior worsened and he continued to constantly e-mail, message, hover, and follow Dr. King. Dr. King sent multiple messages to Denise Robertson (Divisional Director of Human Resources), Joanne Dzubak (EAP Workplace Consultant at Beacon Health Options), Mike Tiesi (Senior Regional Director Pharmacy CHI Fargo and CHI Health), and Todd Hoffman voicing her concerns and discomfort.

26. On May 14, 2015, Mr. Kelly brought a camera to work.  It was a Thursday, and Ms. Thiede's last day of work at Bergan Mercy Hospital.  Mr. Kelly chased Ms. Thiede and Dr. King around the pharmacy with the camera so that he could have a picture of the two together at his house.

27. On May 21, 2015, Mr. Tiesi sent Dr. King an e-mail stating that he had "great concerns about the safe work environment" for Dr. King, staff, and patients. Mr. Tiesi expressed, that he had suggested to Todd Hoffman, that Mr. Kelly no longer continue as an employee at Bergan Mercy Hospital.  Mr. Tiesi supported his concerns with the fact that Mr. Kelly was preventing Dr. King from doing her job.

28. That same day, Dr. King received an email from Mr. Hoffman suggesting that she only correspond with Mr. Kelly through work email and for work related questions only. Mr. Hoffman stated that he would be coming up with a plan for the next steps to take.

29. No remedial action was taken.

30. Mr. Kelly's harassing conduct exacerbated Dr. King's gastroesophageal reflux disease to the extent that her health has not been the same since prior to being harassed.

31. On or about May 22, 2015, Dr. King's health and stress from Mr. Kelly's harassment had escalated significantly, to the extent that she did not sleep for days, had horrible chest pain, and ended up in the Emergency Room (ER) on the verge of having a stress ulcer. Dr. King was eventually discharged from the ER and diagnosed with Gastritis; she was prescribed ondansetron (nausea), an antibiotic, and omeprazole (ulcer preventative).

32. On May 26, 2015, Dr. King, Ms. Robertson, Mr. Tiesi and Mr. Hoffman met to detail the exact severity of Mr. Kelly's behavior. Dr. King again expressed that she was fearful for her safety and the safety of her employees.

33. That same day, Ms. Robertson, Mr. Hoffman, and Mr. Evans spoke to Mr. Kelly, who admitted that he had engaged in stalking and predatory behaviors toward Dr. King.

34. On or about May 27, 2015, Ms. Robertson asked Dr. King to meet with her and Mr. Kelly. Dr. King made it clear that she was afraid of Mr. Kelly, but she was forced to face him regardless. No disciplinary action was taken, and Mr. Kelly was told to speak with a supervisor other than Dr. King.

35. Mr. Kelly continued to harass Dr. King. On May 28, 2015, Dr. King and Mike Tiesi exchanged email correspondence regarding Mr. Kelly's on-going behavior. Dr. King forwarded the email correspondence to Denise Robertson who dismissed Dr. Kings concerns.

36. Dr. King spoke to Chris Evans on several occasions about her concerns and he suggested that Dr. King work from home. Dr. King responded that this was an unrealistic option because she was responsible for the supervision of employees.

37. Dr. King attempted to minimize all contact with Mr. Kelly. She would work with her door closed and would avoid lingering around public areas with staff. Team members who were aware of the dangerous situation would walk Dr. King to her car.

38. Further, Denise Robertson specifically advised Dr. King to have employees walk her to her car, and for Dr. King to stay in her office with the door shut as a way of minimizing the relevant dangers. On several occasions when Dr. King's door was shut, Mr. Kelly would instant message, call, or text Dr. King, and on some occasions Mr. Kelly would do all three.

39. On July 2, 2015, Dr. King sent an e-mail correspondence to Todd Hoffman expressing more concerns regarding Mr. Kelly's behavior. Chris Evans and Mike Tiesi were copied on this correspondence.

40. Around August of 2015, Human Resources asked Mr. Kelly to sign a written boundary to stay away from the Pharmacy and remain at his assigned unit. This document was drafted by Dr. King with the help of Mike Tiesi. The agreement provided for immediate dismissal if Mr. Kelly failed to follow any of its terms.

41. The boundary agreement was never enforced. Instead, Mr. Kelly would get permission and make excuses to go to the Pharmacy for "work related reasons". Mr. Kelly used this permission to harass Dr. King.  Dr. King expressed her frustration to Mike Tiesi several times.

42. Mr. Kelly worked in Bergan's Cardiac Unit. Dr. King's husband had multiple episodes resulting from Atrial Fibrillation in the Fall of 2015. Dr. King had to schedule her husband's heart surgery at a different hospital instead of Bergan to avoid Mr. Kelly. Dr. King informed Mike Tiesi of this decision.

43. On December 8, 2015, Dr. King again discussed her concerns with Mike Tiesi by e-mail who suggested that she obtain a restraining order.

44. On December 30, 2015, Dr. King went to Mr. Tiesi about another incident with Mr. Kelly. Mr. Tiesi dismissed her concerns and said that "if there is any clinical or patient care concerns, those would be more beneficial."

45. On January 20, 2016, Mr. Kelly clocked out and lingered in the Pharmacy which directly violated the boundary agreement signed in August of 2015. Dr. King reported this incident to Mr. Tiesi who stated that he would note Mr. Kelly's file, no further action was taken.

46. In February of 2016, several CHI employees voiced their concerns about Mr. Kelly to Mr. Tiesi about concerning text messages they have received from him. On February 16, 2016, Joni Street e-mailed Mr. Tiesi with concerns over another pharmacy employee being left to work alone with Mr. Kelly.

47. Mr. Kelly made multiple demands to Mr. Tiesi that he be able to meet with Dr. King, going as far as demanding a meeting take place. Dr. King told Mr. Tiesi that she was afraid to meet with Mr. Kelly.

48. On February 26, 2016, Dr. King filed for a protection order in the District Court of Douglas County, Nebraska under the Case ID CI 16-1548. The protection order was granted by Honorable John E. Huber and served upon Mr. Kelly. Mr. Kelly was enjoined from imposing any restraint upon the person or liberty of Dr. King or her family. He was enjoined from harassing, threatening, assaulting, molesting, attacking or otherwise disturbing the peace. Mr. Kelly was also enjoined from telephoning, contacting or otherwise communicating with Dr. King or her family.

49. On February 29, 2016 Dr. King e-mailed Denise Robertson requesting guidance on how to communicate to staff that Mr. Kelly cannot be on campus per the terms of her protection order. Kevin Nokels (President of CUMC), Marie Knedler (President of Bergan), Mike Tiesi, and Andrea Hunter (Security) were copied in this correspondence.

50. In response to Dr. King's email, Ms. Robertson scheduled Dr. King to meet with her the following morning and told Dr. King to not talk to anyone about the protection order at that time. During the meeting Ms. Robertson stated that Mr. Kelly had rights too and continued to not

7

enforce the protection order.  Dr. King was instructed to tell other employees that Mr. Kelly was on leave and to contact security if he was spotted.

51. On March 2, 2016, following the advice of CHI's Legal Department, Ms. Robertson e-mailed Dr. King giving her permission to verbally talk to staff about the protection order.

52. On March 17, 2016, Dr. Kevin Reagan, Chief Medical Officer at Bergan Mercy, informed Dr. King that her protection order was not being taken seriously. He said he had been told that the Harassment Protection was not in effect until Dr. King went to court. When Dr. King informed Dr. Reagan that her protection was legitimate, and she had already been to court, he expressed his disappointment to how her issue was handled.

53. On March 22, 2016, Dr. Reagan informed Dr. King that Ms. Robertson should be reaching out to her again, but this did not occur until after Dr. King's resignation.

54. Over a year had past since Dr. King first expressed her concern, and on March 23, 2016 Dr. King had no other choice but to resign due to CHI's lack of response to her wellbeing.

55. On March 24, 2016, Dr. King received an email from Dr. Reagan expressing his disappointment in how the situation was handled and that he was personally sorry to see her leave CHI.

56. On March 25, 2016, Dr. King received an e-mail from Mr. Tiesi who asked her to cancel Mr. Kelly's FMLA so that he can put in the termination request. Dr. King received text messages from staff who heard that Mr. Kelly may have been dismissed by telephone that evening while he was still on FMLA.

57. On March 29, 2016, Dr. King received an automatic email from Human Resources indicating that Mr. Kelly was terminated beginning April 4, 2016 for "not meeting job expectations".

58. Shortly after Dr. King's termination, she was medically diagnosed with post-traumatic stress disorder (PTSD).

59. Recently in or about June of 2018, Dr. King, through her new job at Department of Health and Human Services (DHHS), inspected a Walmart Pharmacy in McCook, Nebraska. During the inspection Dr. King realized that Mr. Kelly was employed by the pharmacy and instantly had a panic attack, anxiously going into fight or flight mode.

## COUNT I: SEXUAL HARRASMENT AS A FORM OF DISCRIMINATION

60. Paragraphs 1 through 59 are restated and reincorporated as if fully set forth herein.

61. By the above facts, CHI has violated Title VII by discriminating against Dr. King, due to her sex, including subjecting her to a hostile work environment.

62. CHI's conduct subjected Dr. King to a hostile work environment that was objectively, as well as subjectively, severe and pervasive, and materially altered her working conditions.

63. Dr. King was subjected to unwelcome sexual conduct and advances on a daily basis.

64. CHI knew or should have known of the hostile work environment and failed to take proper remedial actions.

65. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT II: INTENTIAL INFLICTION OF EMOTION DISTTRESS

66. Paragraphs 1 through 65 are restated and reincorporated as if fully set forth herein.

67. As the direct victim of sexual harassment, Dr. King was subjected to an intentional infliction of emotional distress. Through the conduct of Mr. Kelly, and CHI's lack of response, Dr. King has suffered emotional distress so severe that no reasonable person should be expected to endure.

68. The conduct Dr. King was subjected to was so outrageous and so extreme as to go beyond all possible bounds of accepted decency.

69. Mr. Kelly was, at all relevant times acting within the scope of his employment.

70. Dr. King's emotional anguish and mental harm were sufficiently severe and were considered medically significant.

71. CHI was the actual and proximate cause of Dr. King's injuries.

72. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT III: NEGLIGENT INFLICTION OF EMOTION DISTTRESS

73. Paragraphs 1 through 72 are restated and reincorporated as if fully set forth herein.

74. As the direct victim of sexual harassment, Dr. King was subjected to a negligent infliction of emotional distress. Through the conduct of Mr. Kelly, and CHI's lack of response, Dr. King has suffered severe emotional distress.

75. CHI placed Dr. King at risk of immediate physical harm and the risk caused her to suffer severe emotional distress.

76. Since the negligent acts, that placed Dr. King at risk of immediate physical harm, Dr. King has been medically diagnosed with multiple medically significant conditions.

77. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT IV: BREACH OF CONTRACT

78. Paragraphs 1 through 77 are restated and reincorporated as if fully set forth herein.

79. CHI made explicit statements to Dr. King and other employees that CHI would provide a safe work environment. Consideration in return for CHI providing a safe work environment was supported by Dr. King's continued employment.

80. Dr. King had a reasonable expectation that CHI would provide such a safe environment.

81. Dr. King fulfilled all the terms and conditions required by her under the contract.

82. CHI failed to provide a safe working environment.

83. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT V: CONSTRUCTIVE DISCHARGE

84. Paragraphs 1 through 83 are restated and reincorporated as if fully set forth herein.

85. Dr. King was subjected to objectively severe harassment, her physical well-being was threatened.

86. CHI did not take her concerns seriously and continued to force Dr. King to work with Mr. Kelly after she notified Human Resources and supervisors of her fears.

87. Dr. King provided CHI with over one year, more than reasonable opportunity, to correct the problem.

88. Dr. King followed everything that CHI instructed her to do throughout the entire process and CHI still failed to adequately remedy the situation.

89. Because of CHI's excessive inaction and dismissal of Dr. King's fears, Dr. King was forced to leave her employment with CHI.

90. Reasonable minds would find the employment conditions objectively intolerable.

91. Dr. King leaving her employment at CHI was a reasonably foreseeable consequence of CHI's unlawful conduct.

92. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT VI: NEGLIGENT HIRING, SUPERVISION, AND RETENTION

93. Paragraphs 1 through 92 are restated and reincorporated as if fully set forth herein

94. Dr. King and other employees continually reported Mr. Kelly's harassing behavior to multiple members of CHI Human Resources and her supervisors on numerous occasions.

95. CHI had a duty to provide a safe work environment and prevent the environment from becoming hostile or abusive.

96. CHI made Mr. Kelly sign a boundary agreement due to his sexually harassing conduct. No other remedial action was taken against Mr. Kelly and the boundary agreement was not enforced.

97. Dr. King was personally victimized and harassed by Mr. Kelly after CHI knew and should have known of Mr. Kelly's harassing behavior.

98. Dr. King complained of the dangerous conduct and was constructively discharged as a result.

99. CHI knew or should have known of Mr. Kelly's propensity, and that he posed a threat to the safety of Dr. King, other CHI employees, and the general public.  CHI subsequently failed to take proper remedial actions.

100. CHI failed to use ordinary care, and because the conduct was reasonably foreseeable, CHI could have prevented Dr. King's injury, had they used ordinary care.

101. CHI created an unnecessary risk by exposing other employees and third-parties to a potentially dangerous individual.

102. Because of CHI's negligent supervision and retention of Mr. Kelly, Dr. King was placed in imminent danger and as a result she suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and severe mental distress.

## PRAYER FOR RELIEF

WHEREFORE Dr. King prays for judgment in her favor and against CHI in an amount equal to damages suffered, for attorney fees, for costs, for pre-judgment and post-judgment interest as provided by law in an amount to be determined by the evidence, and for such other and further relief as this Court may grant.

## JURY DEMAND

Dr. King hereby demands a trial by jury in this action.

DATED this 10th day of July, 2018.

Jennifer King, Plaintiff,

By: _____

Patrick E. McNamara, #25106
McNamara Law Firm, P.C., L.L.O.
17220 Wright Street, Suite 120
Omaha, NE 68130
pmcnamara@mcnamaralawomaha.com
Attorney for Plaintiff

13

IN THE UNITED STATES DISTRICT COURT OF NEBRASKA

| | |
|---|---|
| Jennifer M. King, an Individual,<br>Plaintiff,<br><br>vs.<br><br>Catholic Health Initiatives, a Non-Profit<br>Foreign Corporation Operating in Nebraska,<br>Defendant. | Civil Action No.<br><br><br>COMPLAINT<br><br>(Jury Trial demanded in Omaha, Nebraska) |

## COMPLAINT

Plaintiff, Jennifer M. King, (hereinafter "Dr. King") brings forth this Complaint against Defendant, Catholic Health Initiatives, a Non-Profit Foreign Corporation operating in Nebraska, (hereinafter "CHI") and states as follows:

## INTRODUCTION

1. This is an action for damages to address the deprivation of rights ensured to Dr. King by violating Title VII of the Civil Rights Act of 1964 §2000e *et seq.* on the bases of sex, Section 48-1104 of the Nebraska Fair Employment Act, and other civil causes of action related to her employment as plead herein.

## JURISDICTION AND VENUE

2. Paragraph 1 is restated and reincorporated as if fully set forth herein.

3. The jurisdiction of this Court over the controversy stated above is invoked pursuant to the provisions of 28 U.S.C.A. §1331, the exhaustion of administrative remedies pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, and 28 U.S.C. §1343.

4. Dr. King timely brings this civil action within ninety days of receipt of the Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission issued on May 9, 2018.

5. Dr. King was at all times, and remains a resident of the State of Nebraska, in Douglas

1

County.

6. The majority of events alleged in this Complaint occurred in Douglas County, Omaha, Nebraska.

7. This Court has supplemental jurisdiction over the within claims not involving a federal question.

## PARTIES

8. Paragraphs 1 through 7 are restated and reincorporated as if fully set forth herein.

9. Dr. King is a female and a former employee of CHI and is entitled to protection pursuant to the provisions of Title VII of the Civil Right Act of 1964.

10. CHI is a Non-Profit Foreign Corporation operating in Nebraska that employs greater than fifteen employees and was the former employer of Dr. King within the meaning of Title VII of the Civil Right Act of 1964.

11. Dr. King timely filed a charge of discrimination against CHI based on sex with the Nebraska Equal Opportunity Commission ("NEOC"), complaining of the acts of discrimination set forth below.

12. On May 9, 2018, Dr. King received her right to institute this action by way of Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission.

## FACTS

13. Paragraphs 1 through 12 are restated and reincorporated as if fully set forth herein.

14. Dr. King began her employment at CHI in April of 2003.

15. Dr. King is a Caucasian female from Douglas County, Omaha, Nebraska.

16. During her tenure with CHI, Dr. King was promoted multiple times, ultimately obtaining the position of Director of Pharmacy at Bergan Mercy Medical Center, Creighton

2

University Medical Center, and Lasting Hope Recovery Center.

17. Beginning in late 2014, CHI employee, Lawrence P. Kelly developed a crush on Missy Thiede, a subordinate of Dr. King. After Ms. Thiede informed Mr. Kelly of her disinterest, he continued his pursuit causing Dr. King to reiterate to Mr. Kelly to not bother Ms. Thiede.

18. Mr. Kelly's behavior around Dr. King and Ms. Theide became more alarming. Dr. King reported Mr. Kelly's behavior to her supervisors, Chris Evans and Todd Hoffman in Human Resources.

19. In January of 2015, Mr. Kelly focused his attention on Dr. King, he would repeatedly make statements such as that he was going to disappear and that only one thing can make him stay; Mr. Kelly would hover very closely to Dr. King as he said this.

20. On January 14, 2015, Dr. King forwarded a list to Todd Hoffman on the "red flags" to look for in dangerous stalking behaviors and workplace violence to show how Mr. Kelly was acting in a similar manner.

21. On January 27, 2015, Dr. King inquired with Human Resources about the Family Medical Leave Act (FMLA) for Mr. Kelly who was considering inpatient psychiatric treatment.

22. Mr. Kelly continued to make inappropriate statements to Dr. King. He would grow frustrated when Dr. King would not respond to work text messages and would lurk outside of her office. Mr. Kelly would follow Dr. King around, stare at her for uncomfortable amounts of time, stand uncomfortably close, and intrude on conversations.

23. On March 12, 2015, Mr. Kelly expressed suicidal thoughts to Dr. King and was brought down to the emergency room by Dr. King and Ms. Thiede. Dr. King enrolled Mr. Kelly in FMLA and filed a mandatory report.

24. On March 30, 2015, Dr. King emailed Jeff Newman (Investigator with the Department

of Public Health) outlining Mr. Kelly's behavior up until that point. In that e-mail, Dr. King expressed her fear for her safety as well as the safety of other employees and the public.

25. After six weeks of FMLA leave, Mr. Kelly returned in May of 2015. His behavior worsened and he continued to constantly e-mail, message, hover, and follow Dr. King. Dr. King sent multiple messages to Denise Robertson (Divisional Director of Human Resources), Joanne Dzubak (EAP Workplace Consultant at Beacon Health Options), Mike Tiesi (Senior Regional Director Pharmacy CHI Fargo and CHI Health), and Todd Hoffman voicing her concerns and discomfort.

26. On May 14, 2015, Mr. Kelly brought a camera to work.  It was a Thursday, and Ms. Thiede's last day of work at Bergan Mercy Hospital.  Mr. Kelly chased Ms. Thiede and Dr. King around the pharmacy with the camera so that he could have a picture of the two together at his house.

27. On May 21, 2015, Mr. Tiesi sent Dr. King an e-mail stating that he had "great concerns about the safe work environment" for Dr. King, staff, and patients. Mr. Tiesi expressed, that he had suggested to Todd Hoffman, that Mr. Kelly no longer continue as an employee at Bergan Mercy Hospital.  Mr. Tiesi supported his concerns with the fact that Mr. Kelly was preventing Dr. King from doing her job.

28. That same day, Dr. King received an email from Mr. Hoffman suggesting that she only correspond with Mr. Kelly through work email and for work related questions only. Mr. Hoffman stated that he would be coming up with a plan for the next steps to take.

29. No remedial action was taken.

30. Mr. Kelly's harassing conduct exacerbated Dr. King's gastroesophageal reflux disease to the extent that her health has not been the same since prior to being harassed.

4

31. On or about May 22, 2015, Dr. King's health and stress from Mr. Kelly's harassment had escalated significantly, to the extent that she did not sleep for days, had horrible chest pain, and ended up in the Emergency Room (ER) on the verge of having a stress ulcer. Dr. King was eventually discharged from the ER and diagnosed with Gastritis; she was prescribed ondansetron (nausea), an antibiotic, and omeprazole (ulcer preventative).

32. On May 26, 2015, Dr. King, Ms. Robertson, Mr. Tiesi and Mr. Hoffman met to detail the exact severity of Mr. Kelly's behavior. Dr. King again expressed that she was fearful for her safety and the safety of her employees.

33. That same day, Ms. Robertson, Mr. Hoffman, and Mr. Evans spoke to Mr. Kelly, who admitted that he had engaged in stalking and predatory behaviors toward Dr. King.

34. On or about May 27, 2015, Ms. Robertson asked Dr. King to meet with her and Mr. Kelly. Dr. King made it clear that she was afraid of Mr. Kelly, but she was forced to face him regardless. No disciplinary action was taken, and Mr. Kelly was told to speak with a supervisor other than Dr. King.

35. Mr. Kelly continued to harass Dr. King. On May 28, 2015, Dr. King and Mike Tiesi exchanged email correspondence regarding Mr. Kelly's on-going behavior. Dr. King forwarded the email correspondence to Denise Robertson who dismissed Dr. Kings concerns.

36. Dr. King spoke to Chris Evans on several occasions about her concerns and he suggested that Dr. King work from home. Dr. King responded that this was an unrealistic option because she was responsible for the supervision of employees.

37. Dr. King attempted to minimize all contact with Mr. Kelly. She would work with her door closed and would avoid lingering around public areas with staff. Team members who were aware of the dangerous situation would walk Dr. King to her car.

38. Further, Denise Robertson specifically advised Dr. King to have employees walk her to her car, and for Dr. King to stay in her office with the door shut as a way of minimizing the relevant dangers. On several occasions when Dr. King's door was shut, Mr. Kelly would instant message, call, or text Dr. King, and on some occasions Mr. Kelly would do all three.

39. On July 2, 2015, Dr. King sent an e-mail correspondence to Todd Hoffman expressing more concerns regarding Mr. Kelly's behavior. Chris Evans and Mike Tiesi were copied on this correspondence.

40. Around August of 2015, Human Resources asked Mr. Kelly to sign a written boundary to stay away from the Pharmacy and remain at his assigned unit. This document was drafted by Dr. King with the help of Mike Tiesi. The agreement provided for immediate dismissal if Mr. Kelly failed to follow any of its terms.

41. The boundary agreement was never enforced. Instead, Mr. Kelly would get permission and make excuses to go to the Pharmacy for "work related reasons". Mr. Kelly used this permission to harass Dr. King.  Dr. King expressed her frustration to Mike Tiesi several times.

42. Mr. Kelly worked in Bergan's Cardiac Unit. Dr. King's husband had multiple episodes resulting from Atrial Fibrillation in the Fall of 2015. Dr. King had to schedule her husband's heart surgery at a different hospital instead of Bergan to avoid Mr. Kelly. Dr. King informed Mike Tiesi of this decision.

43. On December 8, 2015, Dr. King again discussed her concerns with Mike Tiesi by e-mail who suggested that she obtain a restraining order.

44. On December 30, 2015, Dr. King went to Mr. Tiesi about another incident with Mr. Kelly. Mr. Tiesi dismissed her concerns and said that "if there is any clinical or patient care concerns, those would be more beneficial."

45. On January 20, 2016, Mr. Kelly clocked out and lingered in the Pharmacy which directly violated the boundary agreement signed in August of 2015. Dr. King reported this incident to Mr. Tiesi who stated that he would note Mr. Kelly's file, no further action was taken.

46. In February of 2016, several CHI employees voiced their concerns about Mr. Kelly to Mr. Tiesi about concerning text messages they have received from him. On February 16, 2016, Joni Street e-mailed Mr. Tiesi with concerns over another pharmacy employee being left to work alone with Mr. Kelly.

47. Mr. Kelly made multiple demands to Mr. Tiesi that he be able to meet with Dr. King, going as far as demanding a meeting take place. Dr. King told Mr. Tiesi that she was afraid to meet with Mr. Kelly.

48. On February 26, 2016, Dr. King filed for a protection order in the District Court of Douglas County, Nebraska under the Case ID CI 16-1548. The protection order was granted by Honorable John E. Huber and served upon Mr. Kelly. Mr. Kelly was enjoined from imposing any restraint upon the person or liberty of Dr. King or her family. He was enjoined from harassing, threatening, assaulting, molesting, attacking or otherwise disturbing the peace. Mr. Kelly was also enjoined from telephoning, contacting or otherwise communicating with Dr. King or her family.

49. On February 29, 2016 Dr. King e-mailed Denise Robertson requesting guidance on how to communicate to staff that Mr. Kelly cannot be on campus per the terms of her protection order. Kevin Nokels (President of CUMC), Marie Knedler (President of Bergan), Mike Tiesi, and Andrea Hunter (Security) were copied in this correspondence.

50. In response to Dr. King's email, Ms. Robertson scheduled Dr. King to meet with her the following morning and told Dr. King to not talk to anyone about the protection order at that time. During the meeting Ms. Robertson stated that Mr. Kelly had rights too and continued to not

7

enforce the protection order.  Dr. King was instructed to tell other employees that Mr. Kelly was on leave and to contact security if he was spotted.

51. On March 2, 2016, following the advice of CHI's Legal Department, Ms. Robertson e-mailed Dr. King giving her permission to verbally talk to staff about the protection order.

52. On March 17, 2016, Dr. Kevin Reagan, Chief Medical Officer at Bergan Mercy, informed Dr. King that her protection order was not being taken seriously. He said he had been told that the Harassment Protection was not in effect until Dr. King went to court. When Dr. King informed Dr. Reagan that her protection was legitimate, and she had already been to court, he expressed his disappointment to how her issue was handled.

53. On March 22, 2016, Dr. Reagan informed Dr. King that Ms. Robertson should be reaching out to her again, but this did not occur until after Dr. King's resignation.

54. Over a year had past since Dr. King first expressed her concern, and on March 23, 2016 Dr. King had no other choice but to resign due to CHI's lack of response to her wellbeing.

55. On March 24, 2016, Dr. King received an email from Dr. Reagan expressing his disappointment in how the situation was handled and that he was personally sorry to see her leave CHI.

56. On March 25, 2016, Dr. King received an e-mail from Mr. Tiesi who asked her to cancel Mr. Kelly's FMLA so that he can put in the termination request. Dr. King received text messages from staff who heard that Mr. Kelly may have been dismissed by telephone that evening while he was still on FMLA.

57. On March 29, 2016, Dr. King received an automatic email from Human Resources indicating that Mr. Kelly was terminated beginning April 4, 2016 for "not meeting job expectations".

8

58. Shortly after Dr. King's termination, she was medically diagnosed with post-traumatic stress disorder (PTSD).

59. Recently in or about June of 2018, Dr. King, through her new job at Department of Health and Human Services (DHHS), inspected a Walmart Pharmacy in McCook, Nebraska. During the inspection Dr. King realized that Mr. Kelly was employed by the pharmacy and instantly had a panic attack, anxiously going into fight or flight mode.

## COUNT I: SEXUAL HARRASMENT AS A FORM OF DISCRIMINATION

60. Paragraphs 1 through 59 are restated and reincorporated as if fully set forth herein.

61. By the above facts, CHI has violated Title VII by discriminating against Dr. King, due to her sex, including subjecting her to a hostile work environment.

62. CHI's conduct subjected Dr. King to a hostile work environment that was objectively, as well as subjectively, severe and pervasive, and materially altered her working conditions.

63. Dr. King was subjected to unwelcome sexual conduct and advances on a daily basis.

64. CHI knew or should have known of the hostile work environment and failed to take proper remedial actions.

65. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT II: INTENTIAL INFLICTION OF EMOTION DISTTRESS

66. Paragraphs 1 through 65 are restated and reincorporated as if fully set forth herein.

67. As the direct victim of sexual harassment, Dr. King was subjected to an intentional infliction of emotional distress. Through the conduct of Mr. Kelly, and CHI's lack of response, Dr. King has suffered emotional distress so severe that no reasonable person should be expected to endure.

68. The conduct Dr. King was subjected to was so outrageous and so extreme as to go beyond all possible bounds of accepted decency.

69. Mr. Kelly was, at all relevant times acting within the scope of his employment.

70. Dr. King's emotional anguish and mental harm were sufficiently severe and were considered medically significant.

71. CHI was the actual and proximate cause of Dr. King's injuries.

72. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

**COUNT III: NEGLIGENT INFLICTION OF EMOTION DISTTRESS**

73. Paragraphs 1 through 72 are restated and reincorporated as if fully set forth herein.

74. As the direct victim of sexual harassment, Dr. King was subjected to a negligent infliction of emotional distress. Through the conduct of Mr. Kelly, and CHI's lack of response, Dr. King has suffered severe emotional distress.

75. CHI placed Dr. King at risk of immediate physical harm and the risk caused her to suffer severe emotional distress.

76. Since the negligent acts, that placed Dr. King at risk of immediate physical harm, Dr. King has been medically diagnosed with multiple medically significant conditions.

77. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

**COUNT IV: BREACH OF CONTRACT**

78. Paragraphs 1 through 77 are restated and reincorporated as if fully set forth herein.

79. CHI made explicit statements to Dr. King and other employees that CHI would provide a safe work environment.  Consideration in return for CHI providing a safe work environment was supported by Dr. King's continued employment.

80. Dr. King had a reasonable expectation that CHI would provide such a safe environment.

81. Dr. King fulfilled all the terms and conditions required by her under the contract.

82. CHI failed to provide a safe working environment.

83. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

## COUNT V: CONSTRUCTIVE DISCHARGE

84. Paragraphs 1 through 83 are restated and reincorporated as if fully set forth herein.

85. Dr. King was subjected to objectively severe harassment, her physical well-being was threatened.

86. CHI did not take her concerns seriously and continued to force Dr. King to work with Mr. Kelly after she notified Human Resources and supervisors of her fears.

87. Dr. King provided CHI with over one year, more than reasonable opportunity, to correct the problem.

88. Dr. King followed everything that CHI instructed her to do throughout the entire process and CHI still failed to adequately remedy the situation.

89. Because of CHI's excessive inaction and dismissal of Dr. King's fears, Dr. King was forced to leave her employment with CHI.

90. Reasonable minds would find the employment conditions objectively intolerable.

11

91. Dr. King leaving her employment at CHI was a reasonably foreseeable consequence of CHI's unlawful conduct.

92. Because of CHI's conduct, Dr. King suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and mental distress.

### COUNT VI: NEGLIGENT HIRING, SUPERVISION, AND RETENTION

93. Paragraphs 1 through 92 are restated and reincorporated as if fully set forth herein

94. Dr. King and other employees continually reported Mr. Kelly's harassing behavior to multiple members of CHI Human Resources and her supervisors on numerous occasions.

95. CHI had a duty to provide a safe work environment and prevent the environment from becoming hostile or abusive.

96. CHI made Mr. Kelly sign a boundary agreement due to his sexually harassing conduct. No other remedial action was taken against Mr. Kelly and the boundary agreement was not enforced.

97. Dr. King was personally victimized and harassed by Mr. Kelly after CHI knew and should have known of Mr. Kelly's harassing behavior.

98. Dr. King complained of the dangerous conduct and was constructively discharged as a result.

99. CHI knew or should have known of Mr. Kelly's propensity, and that he posed a threat to the safety of Dr. King, other CHI employees, and the general public. CHI subsequently failed to take proper remedial actions.

100. CHI failed to use ordinary care, and because the conduct was reasonably foreseeable, CHI could have prevented Dr. King's injury, had they used ordinary care.

12

101. CHI created an unnecessary risk by exposing other employees and third-parties to a potentially dangerous individual.

102. Because of CHI's negligent supervision and retention of Mr. Kelly, Dr. King was placed in imminent danger and as a result she suffered damages including, but not limited to lost wages, fear for her safety, pain and suffering, humiliation, and severe mental distress.

## PRAYER FOR RELIEF

WHEREFORE Dr. King prays for judgment in her favor and against CHI in an amount equal to damages suffered, for attorney fees, for costs, for pre-judgment and post-judgment interest as provided by law in an amount to be determined by the evidence, and for such other and further relief as this Court may grant.

## JURY DEMAND

Dr. King hereby demands a trial by jury in this action.

DATED this 10th day of July, 2018.

Jennifer King, Plaintiff,

By: _____

Patrick E. McNamara, #25106
McNamara Law Firm, P.C., L.L.O.
17220 Wright Street, Suite 120
Omaha, NE 68130
pmcnamara@mcnamaralawomaha.com
Attorney for Plaintiff

13